1  LAWRENCE G. BROWN
   United States Attorney
2  MATTHEW D. SEGAL
   Assistant U.S. Attorney
3  501 I Street, Suite 10-100
   Sacramento, California 95814
4  Telephone: (916) 554-2708





IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 2:09-CR-325 FCD |
| Plaintiff, | |
| | **PLEA AGREEMENT** |
| v. | |
| DONALD TAYLOR, | DATE: August 31, 2009 |
| | TIME: 10:00 a.m. |
| Defendant. | COURT: Hon. Frank C. Damrell, Jr. |

**I.**

**INTRODUCTION**

**A. Scope of Agreement:** The defendant is charged in two cases. The indictment in this case charges the defendant with conspiracy and bank fraud. The superseding indictment in Case No. 2:08-CR-263 FCD charges the defendant with bank fraud and interstate transportation of money obtained by fraud. This document contains the complete plea agreement between the United States Attorney's Office for the Eastern District of California (the "government") and the defendant regarding both of these cases. This plea agreement is limited to the United States Attorney's Office for the Eastern District of California and cannot bind any other federal, state, or local prosecuting,

1

administrative, or regulatory authorities.

**B. Court Not a Party:** The Court is not a party to this plea agreement. Sentencing is a matter solely within the discretion of the Court, the Court is under no obligation to accept any recommendations made by the government, and the Court may in its discretion impose any sentence it deems appropriate up to and including the statutory maximum stated in this plea agreement. If the Court should impose any sentence up to the maximum established by the statute, the defendant cannot, for that reason alone, withdraw his guilty plea, and he will remain bound to fulfill all of the obligations under this plea agreement. The defendant understands that neither the prosecutor, defense counsel, nor the Court can make a binding prediction or promise regarding the sentence he will receive.

## II.

### DEFENDANT'S OBLIGATIONS

**A. Guilty Plea:** The defendant will plead guilty to Count 1, a violation of 18 U.S.C. § 371 (conspiracy). The defendant agrees that he is in fact guilty of these charges and that the facts set forth in the Factual Basis For Plea attached hereto as Exhibit A are accurate.

**B. Restitution:** The Mandatory Victim Restitution Act requires the Court to order restitution to the victims of certain offenses. In addition to that restitution, the defendant agrees that the Court may order full restitution to any person who would qualify as a victim of the following offenses under 18 U.S.C. § 3663 or 3663A had the defendant been convicted of bank fraud based on any other transaction in the scheme set forth in Attachment A. Payment should be by cashier's or certified check made payable to the Clerk of the

2

Court. Defendant further agrees that he will not seek to discharge any restitution obligation or any part of such obligation in any bankruptcy proceeding.

**C. Fine:** The defendant reserves the right to argue inability to pay, but agrees to pay whatever criminal fine the Court might order.

**D. Special Assessment:** The defendant agrees to pay a special assessment of $100 at the time of sentencing by delivering a check or money order payable to the United States District Court to the United States Probation Office immediately before the sentencing hearing.

## III.

### THE GOVERNMENT'S OBLIGATIONS

**A. Dismissals:** The government agrees to move, at the time of sentencing, to dismiss without prejudice the remaining counts in the indictment in this case and the pending superseding indictment in case number 2:08-CR-263 FCD. The government also agrees not to reinstate any dismissed count unless the defendant breaches an obligation set forth in Paragraph VII.B..

**B. Acceptance of Responsibility:** If the United States Probation Office determines that a three-level reduction in the defendant's offense level for his full and clear demonstration of acceptance of responsibility is appropriate under U.S.S.G. § 3E1.1, the government will not oppose such a reduction and will so move under § 3E1.1(b), so long as the defendant pleads guilty, meets with and assists the probation officer in the preparation of the pre-sentence report, is truthful and candid with the probation officer, and does not otherwise engage in conduct that constitutes obstruction of justice within the meaning of U.S.S.G § 3C1.1, either in the

3

preparation of the pre-sentence report or during the sentencing proceeding.

## IV.

## ELEMENTS OF THE OFFENSE

At a trial, the government would have to prove beyond a reasonable doubt the following elements of the offense to which the defendant is pleading guilty in Count 1, conspiracy:

First, beginning on or about July 2006, and ending on or about February 2008, there was an agreement between two or more persons to commit at least one crime as charged in the indictment;

Second, the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it and;

Third, one of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy.

## V.

## MAXIMUM SENTENCE

**A. Maximum Penalty**: The maximum sentence that the Court can impose for conspiracy, 18 U.S.C. § 371, is five years of incarceration, a fine of $250,000, a three-year period of supervised release, and a special assessment of $100. By signing this Plea Agreement, the defendant also agrees that the Court can order the payment of restitution for the full loss caused by the defendant's wrongful conduct. The defendant agrees that the restitution order is not restricted to the amounts alleged in the specific count to which the defendant is pleading guilty. The defendant further agrees that he will not attempt to discharge in any present or future bankruptcy proceeding any restitution imposed by the Court.

4

1    **B.  Violations of Supervised Release:** The defendant understands
2    that if he violates a condition of supervised release at any time
3    during the term of supervised release, the Court may revoke the term
4    of supervised release and require the defendant to serve up to two
5    additional years imprisonment.

## VI.

## SENTENCING DETERMINATION

**A.  Statutory Authority:** The defendant understands that the Court must consult the Federal Sentencing Guidelines (as promulgated by the Sentencing Commission pursuant to the Sentencing Reform Act of 1984, 18 U.S.C. §§ 3551-3742 and 28 U.S.C. §§ 991-998, and as modified by United States v. Booker and United States v. Fanfan, 543 U.S. 220 (VI), 125 S.Ct. 738 (2005)) and must take them into account when determining a final sentence.  The defendant understands that the Court will determine a non-binding and advisory guideline sentencing range for this case pursuant to the Sentencing Guidelines. The defendant further understands that the Court will consider whether there is a basis for departure from the guideline sentencing range (either above or below the guideline sentencing range) because there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines.  The defendant further understands that the Court, after consultation and consideration of the Sentencing Guidelines, must impose a sentence that is reasonable in light of the factors set forth in 18 U.S.C. § 3553(a).

**B.  No Agreement on Sentence:**

The parties have no agreements or understandings as to the appropriate sentence.

5

## VII.

## WAIVERS

**A. Waiver of Constitutional Rights:** The defendant understands that by pleading guilty he is waiving the following constitutional rights: (a) to plead not guilty and to persist in that plea if already made; (b) to be tried by a jury; (c) to be assisted at trial by an attorney, who would be appointed if necessary; (d) to subpoena witnesses to testify on his behalf; (e) to confront and cross-examine witnesses against him; and (f) not to be compelled to incriminate himself.

**B. Waiver of Appeal and Collateral Attack:** The defendant understands that the law gives him a right to appeal his conviction and sentence. He agrees as part of his plea, however, to give up the right to appeal the conviction and the right to appeal any aspect of the sentence imposed in this case so long as his sentence is no longer than the statutory maximum for the offense to which he is pleading guilty. He specifically gives up his right to appeal any order of restitution the Court may impose.

Regardless of the sentence he receives, the defendant also gives up any right he may have to bring a post-appeal attack on his conviction or his sentence. He specifically agrees not to file a motion under 28 U.S.C. § 2255 or § 2241 attacking his conviction or sentence.

Notwithstanding the agreement in Paragraph III.A. above that the government will move to dismiss counts against the defendant, if the defendant ever attempts to vacate his plea, dismiss the underlying charges, or reduce or set aside his sentence on any of the counts to which he is pleading guilty, the government shall have the right (1)

6

to prosecute the defendant on any of the counts to which he pleaded guilty; (2) to reinstate any counts that may be dismissed pursuant to this plea agreement; and (3) to file any new charges that would otherwise be barred by this plea agreement. The decision to pursue any or all of these options is solely in the discretion of the United States Attorney's Office. By signing this plea agreement, the defendant agrees to waive any objections, motions, and defenses he might have to the government's decision. In particular, he agrees not to raise any objections based on the passage of time with respect to such counts including, but not limited to, any statutes of limitation or any objections based on the Speedy Trial Act or the Speedy Trial Clause of the Sixth Amendment.

**C. Waiver of Attorneys' Fees and Costs:** The defendant agrees to waive all rights under the "Hyde Amendment," Section 617, P.L. 105-119 (Nov. 26, 1997), to recover attorneys' fees or other litigation expenses in connection with the investigation and prosecution of all charges in the above-captioned matter and of any related allegations (including without limitation any charges to be dismissed pursuant to this plea agreement and any charges previously dismissed).

**D. Waiver of DNA Testing:** The defendant has received discovery in this case and understands that the government does not intend to conduct DNA testing of any items in this case.

Defendant understands that, before entering guilty plea pursuant to this plea agreement, he could request DNA testing of evidence in this case. The defendant further understands that, with respect to the offense to which he is pleading guilty pursuant to this plea agreement, he would have the right to request DNA testing of evidence after conviction under the conditions specified in 18 U.S.C. § 3600.

1  Knowing and understanding his right to request DNA testing, the
2  defendant knowingly and voluntarily gives up that right with respect
3  to any evidence there may be in this case that might be amenable to
4  DNA testing.  The defendant understands and acknowledges that by
5  giving up this right, he is giving up any ability to request DNA
6  testing of evidence in this case in the current proceeding, in any
7  proceeding after conviction under 18 U.S.C. § 3600, and in any other
8  proceeding of any type.  The defendant further understands and
9  acknowledges that by giving up this right, he will never have another
10 opportunity to have the evidence in this case, whether or not listed
11 above, submitted for DNA testing, or to employ the results of DNA
12 testing to support a claim that defendant is innocent of the offense
13 to which he is pleading guilty.

## VIII.

### ENTIRE PLEA AGREEMENT

16     Other than this plea agreement, no agreement, understanding,
17 promise, or condition between the government and the defendant exists,
18 nor will such agreement, understanding, promise, or condition exist
19 unless it is committed to writing and signed by the defendant, counsel
20 for the defendant, and counsel for the United States.

## IX.

### APPROVALS AND SIGNATURES

23 **A.  Defense Counsel**:  I have read this plea agreement and have
24 discussed it fully with my client.  The plea agreement accurately and
25 completely sets forth the entirety of the agreement.  I concur
26 //
27 //
28 //

8

in my client's decision to plead guilty as set forth in this plea agreement.

DATED: 8/27/09

TIMOTHY ZINDEL
Attorney for Defendant

**B. Defendant:** I have read this plea agreement and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Further, I have consulted with my attorney and fully understand my rights with respect to the provisions of the Sentencing Guidelines that may apply to my case. No other promises or inducements have been made to me, other than those contained in this plea agreement. In addition, no one has threatened or forced me in any way to enter into this plea agreement. Finally, I am satisfied with the representation of my attorney in this case.

DATED: 27 AUG. 2009

DONALD TAYLOR, Defendant

**C. Attorney for United States:** I accept and agree to this plea agreement on behalf of the government.

DATED: August 31, 2009

LAWRENCE G. BROWN
United States Attorney

By: 
MATTHEW D. SEGAL
Assistant U.S. Attorney

**Exhibit A**

**Factual Basis for Plea**

*The Conspiracy*

Beginning no later than July 2006 and continuing at least until February 2008, a group of co-schemers in Sacramento County and elsewhere devised a scheme and artifice to defraud banks and agreed to carry it out. The scheme was to obtain currency on deposit with banks by tricking bank tellers into thinking that "prepaid" credit card accounts had large sums money available for cash transactions when in reality such funds were not available.

The scheme defrauded banks in, among other places, Alabama, Arizona, California, Illinois, Indiana, Montana, New Mexico, Ohio, Oklahoma, and Texas.

Co-schemers caused various card issuers to issue to various account holders pre-paid credit cards bearing the logo either of Visa or MasterCard. Each such pre-paid credit card was actually a debit card, in that the card holder was required to deposit money with the card company and that money would be drawn down as the card was used to make purchases or draw out money.

Co-schemers "loaded" cards with small amounts of money but used them to withdraw as much as $9,500 through fraudulent "cash advance" transactions. Runners with debit cards would be sent into financial institution branches at locations throughout the United States.

Each runner would present his or her debit card for purposes of obtaining cash and instruct a bank teller to call a toll-free number, supposedly to contact a representative of the debit card issuer, in order to facilitate the transaction.

Niesha Jackson, who had a joint bank account with Charles Barksdale, would answer the telephone and misrepresent herself as a card services representative of the debit card issuer. Jackson would mislead bank employees into believing that the debit card had funds available for a currency transaction in excess of the amount loaded on the card.

Jackson would then instruct the teller regarding what buttons to push on the card terminal, and that series of buttons would allow a transaction to go through even if the debit card account did not have sufficient funds in it. The financial institution would then give the runner currency from funds on deposit at the financial institution.

The runner would then keep a portion of the funds for his or herself, and would remit a portion of the fraudulently obtained funds, typically half, to Barksdale, Jackson, and others in the Sacramento area. This would be accomplished by means such as sending money in Federal Express packages, wiring funds, or depositing funds into bank accounts controlled by Barksdale and/or Jackson.

Barksdale and Jackson in the Sacramento area would then receive their portion of the funds by withdrawing the funds and making point-of-sale transactions in the Eastern District of California.

The foregoing would be proven by records reflecting insufficient funds transactions on prepaid credit cards in the names of the runners, bank account records for Charles Barksdale, "Stupid Entertainment," and Jackson, FedEx records, bank surveillance photographs, and testimony.

*Taylor's Role*

Taylor was a "middle man" in the conspiracy. He recruited runners for Barksdale, Jackson, and other higher-ups in the conspiracy. In return, Taylor would get a small share of the take from various transactions for which he had recruited runners.

In February 2008, Taylor had a number of conversations with a confidential source (CS) who, unbeknownst to Taylor, was working under the direction of the FBI in Bozeman, Montana and recording her conversations. Taylor told the CS how to obtain a prepaid credit card and act as a runner in the scheme. On February 12, 2008 Taylor gave the CS a toll-free number that was controlled by Jackson. The CS purported to follow Taylor's instructions to carry out a fraudulent transaction at a bank in Bozeman, and the bogus "card services representative" guided who she thought was a teller through a forced transaction for $9,200.

Afterwards, Taylor told the CS to send $2,500 via Federal Express to Sacramento, to deposit $4,600 into Charles Barksdale's "Stupid Entertainment" account at Wells Fargo, and to send another $1,200 to an address controlled by Taylor. Taylor gave these instructions over the phone from a hotel room in Texas, where, around the same time, someone was depositing thousands of dollars into the Stupid Entertainment account.

Taylor was arrested on May 15, 2008. Confronted with the tape recordings of his conversations, Taylor admitted that he had been the one directing the FBI's CS and that he had been "middle man" for persons acting as runners in the Indianapolis, Indiana area. Taylor stated that he would typically receive 5% to 10% from transactions that he arranged. Taylor admitted that he had introduced Kevin Dixon, aka "Cheese," to the scheme, which led to Eric Mayo's joining.